UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

NAPOLEON WARE,

                Plaintiff,

v.                                                  Case No.  5:05-cv-255-Oc-10GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

                Defendant.
_____

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for a period of disability and disability insurance benefits.  (Doc. 1.)  The Commissioner has answered (Doc. 5) and both parties have filed briefs outlining their respective positions.  (Docs. 11 & 13.)  For the reasons discussed below, the Commissioner's decision is due to be **REVERSED** and **REMANDED** under sentence four of 42 U.S.C. § 405(g).

## I.  PROCEDURAL HISTORY

On May 13, 2002, Plaintiff filed an application for a period of disability and disability insurance benefits claiming a disability onset date of October 16, 2001. (R. 49-51.) Plaintiff's application was denied initially (R. 34-35), and upon reconsideration. (R. 31-33.)  Thereafter, Plaintiff timely pursued his administrative remedies available before the Commissioner, and requested a hearing before an Administrative Law Judge ("ALJ").  (R. 30.)  The ALJ conducted Plaintiff's administrative hearing on May 20, 2004. (R. 230-58.)   The ALJ issued a decision unfavorable to Plaintiff on November 17, 2004

(R. 13-19A.)  The Appeals Council denied Plaintiff's request for review on March 8, 2005 (R. 6-8) and Plaintiff filed the instant appeal to this Court on May 13, 2005. (Doc. 1.)

## II. **STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[1] See 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[5] The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

---

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[18] Walker at 1003.

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III. <u>SUMMARY OF THE RECORD EVIDENCE</u>

Plaintiff was born on April 11, 1972 and was thirty-two (32) years old at the time of the hearing.  (R. 237.)  Plaintiff has a high school education and past relevant work as a bagger, cashier, laborer, salesman, fire alarm technician, janitor and mechanic. (R. 55, 67, 240-41.)  Plaintiff contends that he has been unable to work due to injuries resulting from an October 16, 2001 automobile accident. (R. 54).

On October 30, 2001, Plaintiff was seen by Mark Schellhammer, DO for an evaluation of pain in his neck and left shoulder area. (R. 146-47.)  Plaintiff reported pain in his left shoulder and neck with associated headache.  Dr. Schellhammer noted that x-rays of the cervical spine and left shoulder showed narrowing of the acromioclavicluar joint and minimal degenerative changes at the C4-C5 level and diagnosed Plaintiff with acute cervical strain and left shoulder pain, secondary to strain.  Dr. Schellhammer

---

[19] Wolfe at 1077-78.

[20] See id.

[21] See Doughty at 1278 n.2.

opined that Plaintiff should be limited to no overhead work.  Plaintiff's condition was largely unchanged on November 8, 2001. (R. 144-45.)

On November 19, 2001, Plaintiff reported sudden low back pain after sneezing two days earlier.  (R. 141-42.)  Dr. Schellhammer noted palpable tenderness in the lower lumbar region and that Plaintiff could bend forward only approximately 30°. Dr. Schellhammer noted that Plaintiff was to remain out of work until seen by a neurologist and that otherwise he could return to work with the restrictions of lifting no more than 20 pounds and doing no overhead work.   On December 6, 2001, Dr. Schellhammer limited Plaintiff to no overhead work with the left shoulder.  (R. 139-40.)

On January 10, 2002, Dr. Schellhammer gave Plaintiff a steroid shot. (R. 137-38.)  One month later, Plaintiff reported that he was much improved following the steroid injection and that his neck and left shoulder pain were relieved through use of a heating pad and neurostimulation unit.  (R. 135-36.)  Dr. Schellhammer noted that Plaintiff was returned to work with no restrictions.

On March 18, 2002, Dr. Schellhammer saw Plaintiff for a follow-up evaluation. (R. 130-31.)  Plaintiff reported that his pain had returned in the left shoulder and neck to its pre-injection level.  Dr. Schellhammer ordered an MRI of the left shoulder to rule out a rotator cuff tear and limited Plaintiff to no overhead work.

Plaintiff saw Dr. Schellhammer on April 1, 2002.  (R. 128-29.) Plaintiff reported ongoing discomfort in his left shoulder, especially with overhead activities.  Dr. Schellhammer noted that an MRI dated March 25, 2002 showed evidence of impingement secondary to acromioclavicular joint hypertrophy, with no evidence of a rotator cuff tear and only mild joint effusion.  Dr. Schellhammer diagnosed Plaintiff with

"impingement syndrome, left shoulder."  Dr. Schellhammer noted that Plaintiff had failed nonoperative care and he recommended an arthroscopic subacromial decompression, as well as a resection of the left lateral clavicle to decompress the rotator cuff tendon. Dr. Schellhammer opined that in the meantime, Plaintiff was restricted to no overhead work with the left arm.

On May 9, 2002, Plaintiff was seen by Dr. Schellhammer for a follow-up evaluation.  (R. 127.)  Plaintiff complained of pain radiating from his left shoulder blade down into his mid-back area.  Dr. Schellhammer noted spasm and tenderness at the T8 area on the left and tenderness in the left rhomboid area and into the left supraspinatus. Dr. Schellhammer diagnosed thoracic strain secondary to left shoulder impingement and noted that Plaintiff was "to continue with work restrictions of no overhead work with the left."

On June 19, 2002, Plaintiff was seen by Alexander C. Jungreis, M.D. (R. 183.)[22] Plaintiff reported that he was having difficulty carrying out almost all activities of daily living and that the medication was no longer helpful.  On physical examination, Dr. Jungreis noted decreased range of motion, particularly on extension with a lot of point tenderness along the right L4, L5 and S1 regions.  Dr. Jungreis assessed lumbar radiculopathy, probable lumbar facet syndrome and spondylosis.

On July 17, 2002, Plaintiff returned to Dr. Jungreis and reported substantial problems with his low back.  (R. 182.)  Dr. Jungreis noted persistent diminished range of motion of the lumbar spine, particularly in extension with point tenderness along the

---

[22] This treatment note refers to a May 21, 2002 visit, however, there are no records of medical visits prior to June 19, 2002.

right L4, L5 and S1 regions.  Dr. Jungreis assessed lumbar radiculopathy, lumbar spondylosis and chronic pain syndrome.

On August 7, 2002, Alexander T. Gimon, Ph.D. performed a general clinical evaluation with mental status.  (R. 172-74.)  Dr. Gimon diagnosed Plaintiff with Mood Disorder due to left shoulder, neck & back injury moderate, with depressive features but concluded that his overall mental status would not prohibit him from employment.  Dr. Gimon further noted that while Plaintiff's mood is depressed, his condition would not warrant a diagnosis of a major depressive disorder.

Plaintiff returned to Dr. Jungreis on August 16, 2002, frustrated by his continued lumbar pain.  (R. 180-81.)  Plaintiff reported that if he did not do a lot of activity his pain was bearable, but that prolonged walking or any prolonged activity resulted in increased pain in his right hip.  Plaintiff reported that his neck was bothering him.   On examination, Dr. Jungreis noted tenderness to palpation in the right at L4, L5 and S1 facet joints, as well as some right sciatic notch tenderness; decreased range of motion most markedly with extension; and spasms in the lower thoracic and lumbar paraspinous muscles.  Dr. Jungreis assessed lumbar radiculopathy and lumbar spondylosis and noted that Plaintiff was "to remain off work."

Plaintiff was seen by Dr. Jungreis on September 11, 2002.  (R. 184.)  Plaintiff reported increased left shoulder pain after pulling weeds the previous week.  Dr. Jungreis noted tightness of the trapezius muscles bilaterally and limited range of motion of the cervical spine due to spasms.   Dr. Jungreis noted that Plaintiff was "off of work at this time."  That same day, Dr. Jungreis completed a form entitled "Medical Source Statement Of Ability To Do Work-Related Activities (Physical)."  (R. 175-77.)  Dr.

8

Jungreis noted that Plaintiff could occasionally lift ten pounds and frequently lift less than ten pounds; stand and/or walk less than two hours in an eight-hour workday and he would need to periodically alternate sitting and standing to relieve pain or discomfort. Dr. Jungreis further concluded that Plaintiff could never climb ramps/stairs/ladder/rope/scaffold and could occasionally balance, kneel, crouch or crawl. Additionally, Plaintiff was limited in reaching in all directions (including overhead) and in handling (gross manipulation.)

On October 19, 2002, Dr. Jungreis noted that Plaintiff had been approved for rhizotomy of the lumbar spine. (R. 179.) Dr. Jungreis also noted persistent diminished range of motion of the lumbar spine and that while Plaintiff could flex his knees, he could not extend greater than 5 degrees. Plaintiff had significant point tenderness along L3, L4, L5 and S1, right greater than left. Plaintiff was to remain off work. On October 29, 2002, Plaintiff continued to complain of severe pressure in the middle of his low back with pain radiation and numbness laterally down the right lower extremity. (R. 178.) Plaintiff also complained of a lot of swelling with increased activity. Dr. Jungreis noted that he would continue to keep Plaintiff off work until the first of 2003 to perform the rhizotomy and start physical therapy. There is no record of Plaintiff ever having the rhizotomy. (R. 251-52.)

On December 4, 2002, Plaintiff was seen by Dr. Jungreis. (R. 207-08.) Plaintiff reported that although Duragesic had decreased his pain, it made him very sleepy. Plaintiff complained of pain, primarily bilaterally in the lumbar spine, with radiation down the right lower extremity and a lot of numbness especially in his feet and toes. He reported a lot of discomfort, spasms traveling all the way up into the thoracic spine and

cervical and shoulder pain.  Dr. Jungreis noted diminished range of motion of the lumbar spine primarily with extension but also with flexion and lateral bend; significant point tenderness along the L3-4-4S1 levels; and paraspinal spasms.

On December 20, 2002, Plaintiff continued to complain of increased pain, especially with lifting in the left arm and constant tingling in his right lower extremity.  (R. 210.)  Dr. Jungreis stated that Plaintiff had reached maximum medical improvement and that he should be on permanent light duty, full time with the permanent restrictions of no lifting over fifteen pounds.

On July 15, 2004, George Bitting, M.D. performed a consultative evaluation of Plaintiff.  (R. 217-23.)  Dr. Bitting noted normal muscle tone and bulk and 5/5 muscle strength throughout the bilateral upper and lower extremities, except for 4+/5 muscle strength in the supraspinatus and infraspinatus muscles of the left shoulder.  Dr. Bitting further noted a palpable trigger point in the bilateral upper trapezius muscles.  The trigger point in the right upper trapezius caused neck pain and there was mild lumbar paraspinal muscle spasms.   Dr. Bitting opined that although Plaintiff has chronic pain it was well-managed with his current medications and that Plaintiff should be able to obtain gainful employment.  Dr. Bitting recommended a work hardening program and physical therapy.  Dr. Bitting completed a work related functional assessment form finding that Plaintiff could frequently lift twenty pounds and occasionally lift twenty-five pounds; stand and/or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; and that he was limited to frequently reaching in all directions including overhead and occasionally climbing, balancing, kneeling, crouching, crawling and stooping.

Two physical RFC assessments were performed by non-examining state agency physicians. (R. 164-71, 199-206.) Jim Takach, M.D. performed an evaluation on July 23, 2002 and concluded that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; stand and/or walk and sit for about six hours in an eight-hour workday; was limited in his ability to push and/or pull and reach in all directions; should never climb ladder/rope/scaffolds and could occasionally climb ramp/stairs, balance, stoop, kneel, crouch and crawl; and should avoid even moderate exposure to hazards. Cristina B. Rodriguez, M.D. performed an evaluation on December 5, 2002 and concluded that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; stand and/or walk for about two to four hours in an eight-hour workday; sit for about six hours in an eight-hour workday; push and/or pull without limitation; occasionally climb, balance, stoop, kneel, crouch and crawl; and should avoid concentrated exposure to hazards.

There are also two psychiatric review technique forms of record that were completed by non-examining state agency psychologists. (R. 150-63, 185-98.) James Mendelson, Ph.D., concluded that Plaintiff's affective disorder was not severe and found no functional limitations. Don F. Driggs, Ph.D., concluded that Plaintiff's affective disorder was not severe but that it caused mild restrictions of activities of daily living, mild difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence, and pace.

At the hearing, Plaintiff testified that as a result of an automobile accident on October 16, 2002, he has constant pain in his lower back, neck and arms, headaches and numbness and swelling in his right leg. (R. 241-45.) Plaintiff testified that he has

trouble getting comfortable and that his most comfortable position is reclining and that he can sit in his recliner for about three hours at a time. (R. 243, 245.) Plaintiff testified that he can ride the rider mower for about 15 minutes and drives his children to school in the morning. (R. 244.) Plaintiff explained that he cannot do laundry or dishes because it requires a lot of bending. (Id.) Plaintiff testified that he can lift no more than ten pounds, stand between thirty and forty-five minutes, walk about a block, and sit in a chair about fifteen minutes. (R. 246-47.)

The ALJ determined that claimant suffers from early degenerative disc disease of the cervical and lumbar regions of the spine and degenerative joint disease of the left shoulder. (R. 16.)   While these impairments are severe, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4.   (*Id.*)

The ALJ found that Plaintiff retains the physical RFC to lift and carry at least 10 pounds occasionally, stand or walk at least two hours in an eight hour workday and sit about six hours in an eight hour workday. (R. 17.)  After finding that Plaintiff could not perform his past relevant work, the ALJ used Rules 201.27-201.29 of the Medical-Vocational Guidelines (the "grids")[23] and found that Plaintiff was not disabled because Plaintiff could perform substantially all of the requirements of sedentary work. (*Id.*)  The ALJ did not consult a vocational expert.

---

[23] 20 CFR Pt. 404, Subpt. P. App.2 Rules 202.18 and 202.11.

## IV. **DISCUSSION**

Plaintiff argues that the ALJ erred by relying solely on the grids without the testimony of a vocational expert.[24] Because the ALJ found that Plaintiff could not return to his past relevant work, the burden of proof shifted to the Commissioner to establish that the claimant could perform other work that exists in the national economy.[25] The burden of showing by substantial evidence that a person who can no longer perform his former job can engage in other substantial gainful activity is in almost all cases satisfied only through the use of vocational expert testimony.[26] It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.[27] Exclusive reliance on the "grids" is not appropriate "*either* when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has non-exertional impairments that significantly limit basic work skills."[28] If either condition exists, the ALJ is required to consult a vocational expert.[29]

---

[24] Plaintiff also contends that the ALJ failed to properly evaluate Plaintiff's subjective complaints of pain. The Court finds no error in the ALJ's evaluation of Plaintiff's subjective complaints of pain.

[25] See Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

[26] See id.

[27] See id.

[28] See Phillips v. Barnhart, 357 F.3d 1232, 1242 (11th Cir. 2004)(quoting Francis v. Heckler, 749 F.2d 2565, 1566 (11th Cir. 1985.)

[29] See id.

Plaintiff argues that the ALJ was required to consult a vocational expert based upon Plaintiff's nonexertional limitations (i.e., manipulative limitations and need to alternate between sitting and standing).[30] The ALJ found that Plaintiff retained the RFC to perform sedentary work, and without noting any specific limitations, the ALJ concluded that Plaintiff could perform "substantially all of the requirements of sedentary work." Then, using Rules 201.27-2.01.29 of the grids, the ALJ concluded that Plaintiff was not disabled.

In his RFC analysis, the ALJ accorded the "greatest weight" to the opinions of Dr. Jungreis. (R. 17.)  The ALJ appeared to rely on Dr. Jungreis last treatment note on December 20, 2002, in which he concluded that Plaintiff should be on "permanent light duty, full time with the permanent restrictions of no lifting over 15 pounds." (R. 210.) The ALJ appears to have dismissed Dr. Jungreis' medical source statement completed only three months earlier (R. 175-77), in which Dr. Jungreis opined that Plaintiff would need to periodically alternate sitting and standing to relieve pain or discomfort, that Plaintiff could never climb ramps/stairs/ladder/rope/ scaffold and could occasionally balance, kneel, crouch or crawl, and that Plaintiff was limited in reaching in all directions (including overhead) and in handling (gross manipulation.)  However, there is nothing in Dr. Jungreis' treatment notes to suggest that Plaintiff's condition improved (or even changed) over that three-month period.

Indeed, over the three-month period, Dr. Jungreis consistently noted that Plaintiff had diminished range of motion of the lumbar spine and significant point tenderness

---

[30] See Doc. 15 at 15-18.

14

along L3, L4, L5 and S1.  Additionally, Dr. Jungreis repeatedly recommended that Plaintiff proceed with a rhizotomy of the lumbar spine.[31]  Moreover, on December 4, 2002, Dr. Jungreis stated that he could not discuss maximum medical improvement at that point because of Plaintiff's "significant pain we do not believe that he is able to work."  (R. 207.)  Dr. Jungreis stated that he would discuss maximum medical improvement after Plaintiff had completed a course of physical therapy at his office and had a rhizotomy of the lumbar spine.  Less than three weeks later, without any explanation (and no evidence of Plaintiff attending physical therapy or having a rhizotomy),  Dr. Jungreis stated that Plaintiff should be on "permanent light duty, full time with the permanent restrictions of no lifting over 15 pounds."  (R. 210.)  This conclusory statement was not supported by Dr. Jungreis' treatment notes.

As a result of the ALJ relying on Dr. Jungreis' latter unsubstantiated opinion, the ALJ did not consider what impact the limitations identified by Dr. Jungreis in his earlier medical source statement would have on Plaintiff's ability to perform a full range of sedentary work.  As noted above, Dr. Jungreis opined that Plaintiff must periodically alternate sitting and standing to relieve pain or discomfort.  Social Security Ruling 83-12 provides that an individual who "may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting . . . is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work . . . or the prolonged standing or walking contemplated for most light work."

---

[31] Rhizotomy refers to a section of the spinal nerve roots for the relief of pain or spastic paralysis.  See Stedman's Medical Dictionary "rhizotomy" (27th ed. 2000.)

15

Likewise, Dr. Jungreis opined that Plaintiff was limited in reaching in all directions (including overhead) and handling (gross manipulation.)  While the ALJ accorded greatest weight to the opinions of Dr. Jungreis, he noted that Dr. Jungreis' opinions were "generally consistent" with Dr. Bitting's opinion and Dr. Bitting noted some limitation in Plaintiff's ability to reach in all directions.  (R. 226.)   Additionally, at least one of the non-examining state agency physicians concluded that Plaintiff was limited in reaching in all directions and could do "no overhead reaching." (R. 167.)  Social Security Ruling 85-15 provides that significant limitations of reaching or handling may eliminate a large number of occupations a person could otherwise do and a vocational expert may be necessary to determine the effects of the limitations.

Because the "grid" regulations do not adequately address the limitations identified by Dr. Jungreis, the ALJ was required to obtain vocational expert testimony. Accordingly, this matter is due to be remanded for the ALJ to reconsider, with vocational expert testimony, whether Plaintiff can perform other work which exists in the national economy.

## V. CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner for the Administrative Law Judge to reconsider, with vocational expert testimony, whether Plaintiff can perform other work in the national

economy, and to conduct any additional proceedings the Commissioner deems appropriate. The Clerk is directed to enter final judgment accordingly and close the file

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on July 13, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel